***********
The undersigned reviewed the prior Opinion and Award, based upon the record of the proceedings before Chief Deputy Commissioner Gheen. The appealing party has shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; and having reviewed the competent evidence of record, the Full Commission enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. All the parties are properly before the Industrial Commission, and the Industrial Commission has jurisdiction of the parties and of the subject matter.
2. All parties are subject to and bound by the North Carolina Workers' Compensation Act (hereinafter "Act").
3. All parties have been properly designated and there is no question as to mis-joinder or non-joinder or parties.
4. Plaintiff alleges to have sustained a compensable injury on November 1, 2002.
5. An employment relationship existed between plaintiff and the employer, Richmond Community College (hereinafter "RCC"), on November 1, 2002.
6. Plaintiff's average weekly wage was $579.46, which yields a compensation rate of $386.31.
7. Plaintiff was last employed by RCC as a case manager under a contract of employment for the period of July 1, 2002 through December 31, 2002.
8. Plaintiff's immediate supervisor prior to her alleged injury with RCC was Marvena Rush.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the deputy commissioner, plaintiff was thirty-seven years of age, being born on March 11, 1966. Plaintiff earned an Associates Degree in Human Services from RCC and a Bachelors Degree in Psychology from Pembroke State University. Since graduating from college in 1997, plaintiff has worked as a social studies teacher, basic skills teacher and General Equivalency Degree teacher at RCC. Each of her stints of employment with RCC, including her most recent period of employment, were under short-term contracts.
2. Plaintiff's last employment at RCC was in the Welfare to Work Program (hereinafter "WWP") as a case manager, counseling individuals participating in the WWP. The WWP was administered by RCC under a governmental grant.
3. On November 1, 2002, plaintiff attended a meeting at the Rockingham campus of RCC and was walking to her vehicle following the meeting when she contends she misstepped on the curb, twisted her left ankle and fell face forward onto the asphalt of the parking lot. Her vehicle was parked in the parking lot furnished for employees of RCC.
4. Minutes prior to the fall, plaintiff had a conversation with Michelle Wall (hereinafter "Wall"). The latter's testimony establishes that plaintiff spoke, acted and walked normally.
5. Plaintiff was transported by ambulance to Sandhills Regional Medical Center and admitted in the emergency room for the left ankle injury. Laboratory tests revealed plaintiff had a glucose level of five hundred eight. She was admitted to the hospital overnight on November 1, 2002 due to her elevated blood sugar.
6. Plaintiff sustained an inversion sprain of the left ankle, resulting in a grade four lateral inversion type of sprain with a tearing of the calcaneofibular ligament and compression of the deltoid ligament. She also struck the left side of her body and head on the parking lot. At the time of the fall, plaintiff weighed approximately two hundred seventy-one pounds.
7. The attending emergency room physician recorded plaintiff as reporting that she fell after becoming dizzy.
8. Dr. Fred McQueen (hereinafter "Dr. McQueen"), a board certified family medicine specialist, assumed responsibility for plaintiff's treatment on November 2, 2002. Relying on the emergency room records, he initially recorded in his medical notes that plaintiff became dizzy and fell. When the mechanism of plaintiff's fall became an issue, Dr. McQueen corrected his record to reflect a fall as he recalled plaintiff informing him that she tripped and fell.
9. Plaintiff was discharged on November 4, 2002. Dr. McQueen ordered home physical therapy and crutches for the left ankle injury as well as a home health visit to monitor plaintiff's diabetes.
10. The greater weight of the evidence establishes that plaintiff's left ankle injury was the result of a trip and fall. The emergency room physician's note of plaintiff's report of falling from dizziness notwithstanding, the more convincing evidence is that:
a. Plaintiff reported to Dr. McQueen in the hospital that she had tripped and fell;
b. Laboratory tests confirm that plaintiff had been a diabetic for approximately three months even though evidence in the record also demonstrates that plaintiff was developing diabetes as early as January 2002 and continuing as a series of lab results from another physician demonstrate. Dr. McQueen's opinion is convincing that; having recently developed diabetes; with a documented blood sugar level of five hundred eight at the time of hospital admission; in an individual of plaintiff's weight, it was unlikely that plaintiff lost consciousness and fell on this occasion as she would have a history of dizzy spells prior to this incident;
c. Wall's observation of plaintiff within minutes prior to the incident indicated nothing abnormal in plaintiff's behavior that would suggest plaintiff was experiencing dizziness or mental confusion as a result of her diabetes. Dr. McQueen's testimony further establishes that new diabetics are better able to tolerate higher blood sugar levels than long standing diabetics;
d. The emergency room physician was not presented as a witness and the compelling force of his testimony cannot be weighed beyond his notation; and
e. Plaintiff submitted to a recorded interview with RCC on November 11, 2002 in which she describes a trip and fall.
11. Plaintiff was totally disabled from her ankle injury until December 17, 2002 when Dr. McQueen released plaintiff to return to work at her request. RCC advised plaintiff that she had to return to work by December 17, 2002 in order to qualify for certain bonuses and benefits through December 31, 2002, when the WWP program was scheduled to end. RCC was closed from December 18, 2002 until December 30, 2002. Dr. McQueen ordered a splint for the affected member and restricted her from any prolonged standing and any prolonged walking, which included walking more than fifty feet.
12. The greater weight of the evidence establishes that plaintiff became aware of the denial of her claim at or near the time she returned to work on December 17, 2002. RCC issued a Form 61 denying the claim on December 18, 2002. Plaintiff returned to Dr. McQueen on December 19, 2002, contending RCC would not permit her to wear a splint at work. Dr. McQueen removed plaintiff from further work at RCC based upon plaintiff's representation. Dr. McQueen timely wrote a letter to the WWP in an attempt to correct the medical records as to the cause of injury. RCC's evaluation of Dr. McQueen's letter failed to persuade RCC to accept the claim.
13. The totality of the evidence fails to support plaintiff's assertion that RCC would not permit her to return to work with a splint. The greater weight of the evidence establishes that as of December 19, 2002, plaintiff was capable of returning to work at RCC.
14. Plaintiff did not return to work at other employment at RCC after December 31, 2002 even though plaintiff had worked for RCC as a teacher, counselor, test administrator and case manager. The WWP contract had expired.
15. Plaintiff did not have private health insurance to pay for medical treatment when the WWP program ended and went substantially untreated until September 26, 2003.
16. Plaintiff qualified for unemployment benefits beginning on January 18, 2003. In keeping with the requirements of the Employment Security Commission, plaintiff sought employment within her restrictions but without success. Plaintiff contends she was extremely disadvantaged in her presentation for employment due to her limp, which was the direct result of an unresolved ankle injury. This testimony is not taken as credible by the undersigned as plaintiff's qualifications and prior job experience show that she is able to perform a myriad of jobs regardless of any "limp." Plaintiff's physical limitations, combined with her education and experience, do not prohibit her from working.
17. Plaintiff's counsel arranged an examination with Dr. Rembert A. Crawford (hereinafter "Dr. Crawford"), a board certified podiatrist, on September 26, 2003. Dr. Crawford's examination revealed a positive Tinel sign and ongoing symptomatology that had not abated following the fall. His examination and tests confirm that plaintiff sustained a grade four lateral inversion sprain with tearing to the calcaneofibular ligament and compression of the deltoid ligament. Dr. Crawford concurred with and continued the restrictions imposed by Dr. McQueen of no prolonged standing and no prolonged walking. In addition, Dr. Crawford's testimony establishes that walking beyond the limitations would exacerbate and aggravate her condition further.
18. In Dr. Crawford's opinion, plaintiff's condition had deteriorated since her treatment with Dr. McQueen and the inflammation to the deep peroneal nerve was of such severity as to require tarsal tunnel surgery to correct the ongoing inflammation and swelling of plaintiff's left ankle. An MRI was performed to determine the extent of soft tissue or nerve damage plaintiff sustained; however, the results of the MRI test had not been received as of the date of his deposition.
19. Dr. Crawford opines that the grade four lateral inverse sprain and resulting injury to the deep peroneal nerve were caused by plaintiff's fall. Dr. Crawford's opinions clearly rest upon the accuracy of plaintiff's description of the mechanism of injury. Dr. Crawford's opinion that surgery is required is undisputed on the present record and his opinion is compelling.
20. Dr. Crawford's testimony also excludes plaintiff's diabetic condition as causing the conditions he found in her ankle. The evidence establishes that if plaintiff had diabetic neuropathy, the condition would usually present bilaterally.
21. Plaintiff advised the Employment Security Commission that she was no longer able to look for work as of October 18, 2003. Plaintiff was, at the time, otherwise eligible to apply for an extension of her unemployment benefits.
22. RCC contends that plaintiff has not secured employment since the end of her employment with the WWP because of her own counterproductive attitude. Plaintiff testified that she assumes employers will not be interested in hiring her because of her limp. RCC contends this type of negative outlook became a self-fulfilling prophecy. RCC asserts that plaintiff is "unintentionally sabotaging" her ability to obtain new jobs for which she is very well qualified by means of education and experience. RCC concludes that, "[a] negative attitude is not a compensable injury."
23. RCC effectively impeached plaintiff's credibility to an appreciable degree, in addition to the matters of credibility previously noted, as follows:
a. Prior to her release to return to work by Dr. McQueen and at a time when reporting significant problems with her ankle, plaintiff was observed by an RCC administrator walking without apparent difficulty;
b. Dr. McQueen's office note on December 19, 2003 reflects that plaintiff was seeking to pressure RCC because her claim was denied; and
c. Dr. Crawford testified that plaintiff informed him that her diabetes had been well controlled, which was directly impeached by Dr. McQueen's credible testimony.
24. The greater weight of the evidence establishes that plaintiff did not make reasonable efforts to find suitable employment within her physical limitations resulting from her injury. Plaintiff was clearly able to return to work following the injury. The only reason that plaintiff did not continue in that position was that the program under which she was employed lost federal funding. The inability of plaintiff to continue in that position, therefore, is unrelated to her injury.
25. RCC's denial of plaintiff's claim is marginally tenable based upon the notes of the emergency room attending physician at Sandhills Regional Medical Center that plaintiff reported falling as a result of dizziness. This physician's note combined with the discovery that plaintiff had a serious elevation of blood sugar at the time of her fall provided a foundation on which to question the causation of plaintiff's injury. Dr. McQueen's letter to RCC corrected his erroneous medical note as to the cause of plaintiff's fall, but did not vitiate the record of the emergency room attending physician.
26. Plaintiff's counsel has provided valuable legal services, including, but not limited to, the preparation and trial of this action. Plaintiff's counsel has petitioned for an attorney fee of twenty-five percent of the weekly disability benefits awarded. The fee requested is customary and is reasonable under the facts of this case.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. Plaintiff sustained an injury by accident to her left ankle on November 1, 2002. N.C. Gen. Stat. § 97-2(6).
2. Dr. McQueen's testimony establishes that plaintiff was temporarily totally disabled and unable to work at any trade, occupation or employment as a result of her injury by accident on November 1, 2002 through December 17, 2002. N.C. Gen. Stat. § 97-29.
3. Plaintiff has the burden of proving that she has been unable to earn her pre-injury wages. Russell v. Lowes Product Dist., 108 N.C. App. 762,765, 425 S.E.2d 454, 457 (1993). Plaintiff has failed to prove by the greater weight of the evidence that she was temporarily totally disabled from the date her employment ended with RCC, December 30, 2002 and continuing through the date of the hearing. The medical evidence establishes that Plaintiff is capable of sedentary work for which she is well suited by education, training and experience.
4. RCC shall provide and pay for all reasonable medical expenses related to plaintiff's left ankle injury that may provide relief, effect a cure or lessen the period of plaintiff's disability. RCC shall not pay for any medical expense related to plaintiff's diabetic condition. The Industrial Commission, in its discretion, may designate a treating physician. N.C. Gen. Stat. § 97-25.
5. The Industrial Commission may award attorney fees if it determines that any hearing has been brought, prosecuted or defended without reasonable grounds pursuant to N.C. Gen. Stat. § 97-88.1. The purpose of this statute is to prevent stubborn, unfounded litigiousness, which is inharmonious with the primary purpose of the Act to provide compensation to injured workers. Chavis v. Thetford Property Management, Inc.,155 N.C. App. 769, 573 S.E.2d 209 (2003). RCC's defense of this claim as to compensability under the Act was reasonably based on the record of the emergency room attending physician.
6. Plaintiff's counsel has provided valuable legal services, including, but not limited, to the preparation and trial of this action. An attorney fee of twenty-five percent of the weekly disability benefits awarded is not unreasonable and should be approved. N.C. Gen. Stat. §97-90.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the undersigned enters the following:
 AWARD
1. RCC shall pay plaintiff weekly temporary total disability benefits in the amount of $386.31 from November 1, 2002 through December 17, 2002. RCC shall pay all sums accrued to the date of this Award in one lump sum, subject to plaintiff's reasonable attorney fees provided hereinafter.
2. RCC shall pay for all of plaintiff's reasonable medical expenses related to her injury by accident to her left ankle, specifically to including treatment by Drs. McQueen and Crawford, as well as all other treatment reasonably necessary to effect a cure, give relief or reduce the period of disability when the same have been submitted to and approved by the Industrial Commission in accordance with law and administrative regulations. The surgery recommended by Dr. Crawford is specifically authorized and shall not require pre-authorization by RCC.
3. RCC shall not pay for medical treatment related to plaintiff's diabetic condition. Counsel for RCC and plaintiff shall examine plaintiff' medical expenses to identify those medical services related to Plaintiff' diabetic condition. If the payment of any medical expense shall be disputed between the parties, the parties shall submit the matter for further hearing.
4. Dr. Crawford is designated as plaintiff's primary treating physician for her ankle injury.
5. Plaintiff shall pay her counsel twenty-five percent of all weekly disability benefits as a reasonable attorney fee. RCC shall deduct the attorney fee from the liquidated amount due Plaintiff and pay the same directly to plaintiff's counsel. RCC shall thereafter deduct every fourth weekly disability benefit payment due plaintiff and pay the same directly to plaintiff's counsel.
6. RCC shall pay the costs of this action.
This the ____ day of February, 2005.
 S/____________ BUCK LATTIMORE CHAIRMAN
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/_______________ DIANNE C. SELLERS COMMISSIONER